BIGLER v. AVERY. See Case No. 14,481.

BIGLER, (PARKER v.) See Case No. 10,-726.

---

## Case No. 1,404.

### BIGLER v. WALLER.

[Chase, 316;[1] 3 Am. Law T. Rep. U. S. Cts. 157; 4 N. B. R. 291, (Quarto, 86;) 3 Chi. Leg. News, 26; 5 Am. Law Rev. 570.]

Circuit Court, D. Virginia. Sept., 1870.[2]

WAR—INTEREST—SUSPENSION—END OF CIVIL WAR — DAMAGES TO ESTATE PAID IN CONFEDERATE MONEY—CREDITS.

1. The supreme court of the United States having held (Hanger v. Abbott. 6 Wall. [73 U S.] 532,) that the late war suspended the statute of limitations. and in Ward v. Smith, 7 Wall. [74 U. S.] 452, that interest did accrue during the war, in that particular case, making an exception to the general rule that interest does not accrue between citizens, or subjects of belligerent states, it may not unreasonably be inferred from the language of the court that if the direct question came before them it would be decided that interest did not accrue between parties to the late civil war.

[Cited in Brown v. Hiatt, Case No. 2,011.]

2. It is the duty of this court to decide the question as it believes the supreme court would decide it. Bigler, a citizen of New York, was indebted to Waller, a citizen of Virginia, in the sum of thirteen thousand dollars, due for land sold by Waller to Bigler, which sum was due and payable May 10, 1861. Bigler was ex-

[1] [Reported by Bradley T. Johnson, Esq., and here reprinted by permission.]

[2] [Reversed by the supreme court in Bigler v. Waller, 14 Wall. (81 U. S.) 297.]

cluded from occupation of the estate during the war, the improvements placed on it by him were greatly injured, and Waller was entitled to possession during the war by virtue of a sale under a trust deed and purchase by him of the property. If interest on a debt should cease in any case it should in this.

3. The proclamation of President Lincoln of April 19, 1861, declaring a blockade of the ports of the insurgent states must be regarded as the first formal recognition of the existence of civil war by the national authority. The supreme court has held that the war ended on August 2, 1866, so far as the captured and abandoned property act is concerned, but they have declined fixing any precise date of termination applicable to all cases. In this case the establishment of the adhering government of Virginia at Richmond as the recognized government of the whole state is to be taken as the end of the war in this state. This event took place when the executive department of that government was removed from Alexandria to Richmond, on May 26, 1865. The period to be excluded in the computation of interest is the time from April 19, 1861, to May 26, 1865.

4. Confederate money received by Waller from the Confederate government, for damages done the property after Waller was in possession of the same, must be scaled down to its gold value as of the date of its receipt and interest to be calculated on the sum thus ascertained. For the amount of this payment and interest Bigler's debt to Waller is to be credited.

5. The proof of damages to Bigler by reason of Waller not performing certain covenants in his contract of sale being too vague and unsatisfactory to form the basis of decree, no damages are to be allowed him.

[See note at end of case.]

[In equity. Suit by James Bigler against William Waller and Robert Saunders to remove cloud from title to land. Decree that complainant pay Waller's administrator the sum of $17,377.48 in United States coin.]

Bigler, a citizen of New York, in May, 1853, purchased from Waller, a citizen of Virginia, the estate of Rippon Hall, consisting of two thousand acres of land, and improvements, lying in the county of York, and state of Virginia. Bigler was to pay Waller thirty thousand dollars for the estate, five thousand dollars in cash and the residue divided during a period of ten years, and accordingly Waller, on May 10, 1853, executed and delivered to Bigler, a deed of the property, who thereupon paid Waller five thousand dollars in cash, and on June 23, 1853, executed and delivered to Saunders as trustee, a trust deed reconveying Rippon Hall to him to secure the payment of the twenty-five thousand dollars due Waller. These payments were to be two thousand dollars on May 10, 1855, with interest on the whole sum unpaid, and one thousand dollars annually on that day, with interest on the whole sum unpaid, until May 10, 1863, when the whole of the twenty-five thousand dollars then unpaid was to become due and to be paid. It was provided that the failure to pay any one of these sums would be considered "a defalcation which shall authorize Waller to require Saunders to execute this trust according to law." It was provided that in case of a sale sixty days

notice should be given in newspapers in Richmond, and the city of New York. Bigler paid all the installments provided for in this deed of trust up to and including May 10, 1860, leaving thirteen thousand dollars due as purchase money secured by this trust deed. He also improved the property by the erection of wharfs, mills, and buildings, and laid off a village and town lots, and built school-houses, and other improvements. But York county extends along the York river to the Chesapeake, and contains within its limits Yorktown, the scene of the termination of the first invasion of Virginia. It is open to the sea, and is covered by the guns of any hostile fleet which rides the waters of its great boundaries. Consequently at the first approach of civil war, the Rippon Hall enterprise was abandoned by its owner and projector, who returned to New York, and made no further sign until June, 1865, when he returned and resumed possession. In the meantime his installment payable May 10, 1861, had become due, and being absent, and presumably unable to return, he did not pay it. Waller then required Saunders, the trustee, to sell under the deed of trust, which he did on April 1, 1862, Waller himself becoming the purchaser for seventeen thousand dollars in money, which was then quite equal in value to greenbacks, and Saunders conveyed the estate to Waller, on receiving Waller's note for the amount due over and above the sum which Bigler owed him. No notice of course was published of the sale in the papers of the city of New York, the state of Virginia then exercising control of York county. In May, 1862, the buildings on the estate were burned by Colonel Duke, an officer of the Confederate army, and the military line of the Confederate states receded up the Peninsula towards Richmond, while those of the United States as regularly followed them, at once inclosing York county and Rippon Hall. McClellan's move in the spring of 1862, placed that part of Virginia permanently within the federal lines, and there was no reason in law nor in fact why Bigler might not have returned to his property in June, 1862, and disregarded the said sale by Saunders of April, 1862. Waller adhered to the side of Virginia, and retired with the forces of the Confederacy, and in 1863, secured the payment of two thousand dollars in Confederate currency for the injury done to the Rippon Hall estate. When the war was over, it seems to have been at once understood that the sale and deed of April, 1862, by Saunders to Waller, were utterly void, for Bigler forthwith in June, 1865, re-entered into possession of his property, and Waller proceeded to bring suit against him in New York for the thirteen thousand dollars and interest, the balance of the purchase money due him. At that time the courts of New York were much more apt to respect any rights which he might have had against Bigler, than those of the restored state of Virginia. In order to

draw off the attack in New York, this bill was filed in this court by Bigler against Waller, charging that Waller claimed thirteen thousand dollars due him for unpaid purchase money, when in truth there was not a cent due, which claim it was charged was a cloud on the title, and the court was prayed to remove the same, by decreeing that Waller owed money to Bigler for damages done the estate, during Waller's constructive possession, largely over and above the purchase money unpaid. Whereupon after much endeavor the New York proceedings were all stopped, and the questions came up before this court for decision.

J. K. Hayward, for complainant.

This suit was brought by James Bigler, of New York, against William Waller and Robert Saunders, of Virginia, to remove a cloud from the title to plaintiff's estate situated in York county, Virginia, and called Rippon Hall.

I. In 1853, James Bigler, by his agent, F. W. Hammond, of Virginia, made an agreement in writing with defendant Waller to purchase for thirty thousand dollars, two thousand acres of land in Virginia, called Rippon Hall. This agreement contained the following covenant: "Said Waller will allow said Bigler to sell such portions of the land as he may see fit, from time to time; the said Bigler paying over to said Waller, such proceeds of sales as will afford ample security for the liquidation of the residue of the debt."

II. On May 10, 1853, Bigler paid five thousand dollars of the purchase money; gave his bond for the balance, twenty-five thousand dollars; took a deed of the property, and at the same time took possession of the estate.

III. On June 22, following, Bigler made and delivered a trust deed to Robert Saunders, to secure the payment of the bond, which deed provided for the sale of the estate in default of payment, according to the terms of the bond, in the following manner: "It is understood that in case of sale, the trustee shall give sixty days' notice in newspapers in Richmond and in the city of New York."

IV. The agreement for sale, bond and trust deed are in pari marieta.

V. The plaintiff made improvements on the estate consisting of a wharf, mills, hotel, store, church, school-houses, planted an orchard comprising some thirty thousand fruit trees, laid out a village, and built a large number of private residences, prior to 1857, at an expense of one hundred and fifty thousand dollars.

VI. In the spring of 1854, Bigler contracted to sell portions of said estate (village lots), but was prevented from effecting said sales by Waller's refusal to release his mortgage lien, which refusal damaged the plaintiff to great amount.

VII. The plaintiff fulfilled his agreement until May 10, 1861, when there were thirteen thousand dollars unpaid on the bond.

VIII. The plaintiff, by his tenants, was in actual possession of the estate until the war broke out, in April, 1861. His actual possession of the estate was resumed in June, 1865.

IX. On April 1, 1862, Waller caused a sale of the estate at public auction without the advertised notice provided for in the trust deed, and purchased it himself for seventeen thousand dollars Confederate money, took a deed from the trustee, and gave his notes for the balance of the purchase money over the amount claimed to be due on the bond. Waller exercised various acts of ownership over the estate after this purchase, such as collecting rents, disposing of personal property, &c., as will more fully appear in a subsequent part of the argument.

X. The pleadings show that Bigler claims that the bond has been more than paid, by rent, waste and damages, for which Waller is liable; that the bond ought to be canceled, and judgment entered for the balance found due from Waller to Bigler; also that Waller and Saunders should execute to Bigler a release deed of all claim to said estate; while Waller claims that the sum of thirteen thousand dollars, with interest, still remains due on the bond, and that the mortgage deed should stand until this sum is paid.

XI. At the May term of this court, this cause was referred to George Chahoon, Esq., a commissioner of this court, to state an account between the parties, of what was due to Waller on the bond, and of the offsets in the nature of waste, rent and damages, due from Waller to Bigler; also to make such recommendations as he might think proper. The commissioner attended to his duty and filed his report in the clerk's office on November 2, 1867.

XII. Account A in said report finds thirteen thousand dollars, with interest, to be due from Bigler to Waller on the bond.

XIII. Account B in said report finds forty-three thousand dollars, with interest, to be due from Waller to Bigler on account of damage, waste and rent, claimed in plaintiff's bill.

XIV. Statement C shows a balance of twenty-six thousand one hundred and eighty-six dollars due from Waller to Bigler, for which judgment should be entered in favor of Bigler.

XV. Said report recommends that said bond be canceled, and Waller and Saunders execute a release deed to Bigler, of all claim to the land.

First. The item of three thousand dollars in account B is for Waller's breach of his covenant to release, contained in Ex. A. The evidence proves that soon after the sale May 10, 1863, Bigler laid out a "village" on the estate, and contracted with Johnson, Sterling, and Jones, together "with a half dozen others," to sell to each of them a

"village lot," of "three or four acres," at "three hundred dollars per acre," each lot to be released from Waller's mortgage lien. Waller refused to release, and Bigler lost the sales of said lots thereby. These damages are specific and allowable, being the difference between the then possible price of three hundred dollars per acre, and the actual price afterwards obtained of ten dollars per acre. This Waller does not deny, and I apprehend that there can be no question concerning the amount of the damages suffered on account of the loss of said sales, there being no discrepancy in the testimony concerning this matter. And the court will not fail to observe that in proving the plaintiff's claim we have carefully avoided putting in evidence what might be considered in the nature of speculative or constructive damages. Waller does not deny his refusal to release the "village lots" to "Sterling, Johnson, and Jones," at the request of Bigler, nor attempt to lessen the amount of the land which he puts at "ten, fifteen, or twenty acres," or the price which it would have brought, to Bigler per acre, but claims that such release would have injured the estate, i. e., impaired the security for his debt, to the amount of five thousand dollars. Now, it may be very well said that if the release of these lots would injure the estate five thousand dollars, it would benefit Bigler the same amount, and this sum might properly measure the damages incurred by the plaintiff by the loss of those sales, instead of the three thousand dollars found by the U. S. commissioner. The only defense offered by Waller to this claim for damages was a "second contract," which Waller swore was made June 22, 1853, and which he avers was a substitute for the first; and he further testifies that he had the means of fixing its date precisely, and that it contained the following condition: "The said Waller agrees that said Bigler shall sell such portions of land as he may see fit, provided it does not operate a serious reduction of the security afforded by the trust deed."

In regard to this second agreement, it will be remembered that Waller's deed to Bigler was dated May 10, 1853, and to pretend an agreement for the sale of real estate made more than a month after the sale was completed, and the title passed, is simply nonsensical and absurd. Since Waller does not deny Bigler's offer to pay over to him all the purchase money of said land, the defense set up to this claim utterly fails. I may remark, by the way, that, in explaining the loss of the "second contract," Waller swears in his answer that he deposited the same for record at the York county court-house, and he believed it was destroyed with the records at that place, but on learning from plaintiff's counsel that none of those records were lost, he was ready with another version of the story, equally explicit, and probably equally true. If the force of this portion of

Waller's testimony was not destroyed by the written evidence in the case, e. g., the prior date of the deed, and the language of the bond, together with its own intrinsic contradictions, and was not specifically contradicted by Bigler and by Smith, we might insist upon the application of the maxim "allegans contraria non est audiendus." The bond which Waller pleads recites that the contract for sale was "signed by Hammond," hence the sale must have been based upon the first contract, and not upon the "second," which Waller avers was signed by Bigler; ergo, Waller is estopped from setting up this "second contract." The above facts demonstrate that the agreement of April 3, 1853, was the operative and the only contract between the parties antecedent to the debt. The language of that instrument was "ample security" for the "residue of the deed." This "residue" in the spring of 1854 was necessarily less than twenty-four thousand dollars, probably less than twenty thousand dollars, and the value of the estate, as improved, was more than sixty thousand dollars, leaving it "ample security" for the "residue" of the debt; and this even when diminished in value five thousand dollars (Waller's estimate of the damages for a release), which five thousand dollars would have itself been lessened three thousand dollars, what Bigler offered to pay for a release, leaving two thousand dollars actual damage, according to Waller's estimate, without considering the increased value of the estate from having a village built upon it. It is proved in evidence that this identical claim of three thousand dollars damage in a similar suit in the supreme court of the state of New York, between the same parties, Waller and Bigler, has been adjudicated already, and a judgment entered therein in favor of Bigler against Waller, which is still in force, and not impeached or reversed. Waller having brought a suit against Bigler on the bond in the supreme court of the state of New York, the court had jurisdiction of the parties and of the subject-matter, so that that adjudication referred to is conclusive and binding upon the parties until reversed. The subject-matter of this point "transit in rem judicatam." [U. S. v. Leffler,] 11 Pet. [36 U. S.] 100; 18 Johns. 433; Broom, Comm. 369 et seq. A judgment record of a sister state, duly authenticated, is conclusive. Dobson v. Pearce, 12 N. Y. 156; 1 Abb. Pr. 97; 1 Duer, 142; Const. U. S. art. 4, § 1, [1 Stat. 18;] Acts Cong. May 26, 1790, [1 Stat. 122, c. 11;] and March 27, 1804, [2 Stat. 299, c. 56, § 2.]

Second. The United States commissioner found that Waller was liable for twenty-five thousand dollars waste done to the realty.

I. Waller was liable for this waste, for he was in possession of the estate when the waste was committed.

II. If Waller was in either actual or constructive possession he would be equally

liable whether the waste was committed by himself, by his lessees, or by strangers.

III. The plaintiff claims that Waller was in actual or constructive possession, from April, 1862, until June, 1865, as a disseisor, and that during that period twenty-five thousand dollars waste (and much more) was committed on the estate by the rebels, who were Waller's lessees at the time. Colonel Duke, an officer of the Confederate army, burned two mills and the wharf, worth thirty-two thousand dollars, May 2, 1862, and injured the houses. The question of "adverse possession is a legal idea, admits of a legal definition, of legal distinctions, and is a question of law." [Bradstreet v. Huntington,] 5 Pet. [30 U. S.] 402. Waller has no equity to say that he is not responsible for the acts of the rebels, for he voluntarily assumed the responsibilities of a disseisor, so far as the plaintiff is concerned, by the unlawful manner in which he (Waller) got possession, and also by his voluntary aid to the rebels, and his voluntary lease to them of portions of the premises. The facts upon which the plaintiff relies, to show Waller's possession at the time of the waste, are taken from Waller's testimony, and may be supposed, from its unveracious character, to be strained to the last degree of intendment, exculpatory of himself.

The defendant Waller admits substantially the following facts: (a). Waller caused a void sale of the estate under the mortgage deed, April 1, 1862, and that, too, when it was impossible for Bigler to protect it. (b). Waller attended said sale on the premises, and guarded by rebel forces, purchased an estate worth one hundred and eighty thousand dollars for seventeen thousand dollars Confederate money. (c). Waller took a deed of the estate from the trustee, and paid the balance of the purchase money, some two thousand dollars Confederate money. (d). Waller found the rebel authorities in possession of the estate at the time of his purchase. (e). Waller claimed and received two thousand dollars in realty, four thousand five hundred dollars—of the rebel authorities, for the occupation of the estate, in 1863 or 1864. (f). Waller sold or made an agreement to sell the estate in Richmond during the war. (g). Waller disposed of personal property on, and belonging to the estate, in 1863 or 1864. (h). Waller contracted to have the mill removed to Richmond for sale, during the war, to enable the spy Knapp to have the appearance of a legitimate business while betraying the movements of the Federal army. (i). Waller has always claimed to own the estate since the pretended purchase, especially to Bigler in 1865. (j). The tenants whom Bigler found in possession of the estate in 1865 claimed to hold under Waller, and refused to attorn to plaintiff. (k). Waller performed all the acts of ownership or possession possible, under the circumstances at that time, to show that he claimed to be the owner of the property. (l). Waller purchased and entered April 1, 1862, and took the esplees till June, 1865. Therefore he was an actual disseisor of the plaintiff's estate during that period, he having "entered without right, under claim and color of title, and took the esplees."

Bigler elects to consider himself disseised by Waller during the period from April 1, 1862, until June, 1865. 4 Kent, Comm. § 482 et seq.; Id. (11th Ed.) p. 83; 2 Washb. Real Prop. 484, 286; Melvin v. Proprietors, etc., 5 Metc. [Mass.] 15, 32; Comins v. Comins, 21 Conn. 413; 12 Johns. 118; 18 Johns. 355, and cases cited; Crabb, Real Prop. 1006; 16 Mo. 273; 8 N. H. 52 et seq. Said the court in a late case: "But almost any interference with the possession of land in derogation of the rights of the owner, may, if he (owner) so choose, be considered as a disseisin. . . The elements of actual disseisin are, entering and intending to usurp possession; yet we have seen that one may become a disseisor, though entering peaceably under a void deed." In Society for Propagation of the Gospel v. Town of Pawlet, 4 Pet. [29 U. S.] 507: "It is distinctly intimated that a possession may be adverse whenever an ouster may be presumed; and also unanimously ruled that it may be adverse and maintain a bar under the statute, even where ouster is in terms repelled and not to be presumed from the very circumstances of the case. The court says a vendee in fee derives his title from the vendor, but his title, though, is adverse to that of the vendor." [Blight v. Rochester,] 7 Wheat. [20 U. S.] 535. "If this be the correct doctrine of the court—and there can be no doubt of it—it seems to follow that wherever the proof is that one in possession holds for himself to the exclusion of all others, the possession must be adverse to all others." [Bradstreet v. Huntington,] 5 Pet. [30 U. S.] 439. "Where one having no title conveys to a third person, who enters under the conveyance, the law holds him to be a disseisor. . . ." "The common law attaches to the disseisin a variety of legal rights and incidents." Bradstreet v. Huntington, 5 Pet. [30 U. S.] 402; Spencer & Storrs, Arguendo, 429. "An entry on the land of another, made under claim or color of right, is an ouster." [Ewing's Lessee v. Burnet,] 11 Pet. [36 U. S.] 41, 52. "So much depends on the nature and situation of the property, the uses to which it can be applied, or to which the owner or claimant may choose to apply it, that it is difficult to lay down any precise rule adapted to all cases. But it may with safety be said that where acts of ownership have been done upon land which, from their nature, indicate a notorious claim of property in it, &c., such acts are evidence of an ouster of a former owner, and an actual adverse possession against him, if the jury shall think that the property was not susceptible of a more strict or definite possession than had been so taken and held; and the continued claim of property has been evidenced by public acts of

ownership, such as he would exercise over property which he claimed in his own right, and would not exercise over property he did not claim." 2 Smith, Lead Cas. (6th Am. Ed.) 642, m. 566. "If a stranger is in possession, under or acknowledging the title of the devisee, or remainder man, it is equivalent to an actual entry." 4 Metc. [Mass.] 67. "A conveyance of wild and vacant lands gives a constructive seisin thereof indeed to the grantee, and attaches to him all the legal remedies incident to the estate." "An entry into a parcel in the name of the whole will inure as an entry into the vacant parcel; under a conveyance taking effect under the statute of uses the bargainee has a complete seisin without actual entry of seisin." Green v. Liter, 8 Cranch, [12 U. S.] 250. Said Lord Mansfield, in Taylor v. Horde, 1 Burrows, 110–112: "The consequences of actual disseisin, considered as such, continue law to this day." "Though our property is allodial, yet feudal tenures, by which this peculiar effect of a disseisin is produced, may be said to exist among us, in their consequences and the qualities which they originally imparted to estates." Supra. "By exercising acts of ownership under the title of the disseisor, the disseisor becomes a disseisor by color of title." 3 Watts, 71. "Disseisors can not qualify their own wrong by alleging that they have entered claiming a less estate than a fee. A party entering upon land under color of title is presumed to enter and occupy according to his title." 11 Fost. [N. H.] 41, 54. "If one enters under a void grant he is a disseisor." 5 Metc. [Mass.] 33. "An entry and possession by a party under a claim of title in himself by virtue of a void grant, whether by parol or otherwise, is not less adverse than if possession were taken and held without any color of title whatever." 21 Conn. 413. "If seisin of a party is proved, the legal presumption is that such seisin continues, and the burden remains on him who alleges a disseisin, even after he has given prima facie evidence of such disseisin." 5 Metc. [Mass.] 173, caption. "Neither actual occupation, cultivation, nor residence are necessary when the property is so situated as not to admit of any permanent useful improvement, and the continued claim of the party has been evidenced by public acts of ownership, such as he would exercise over property which he claimed in his own right, and would not exercise over property which he did not claim." Washb. Real Prop. (Ed. 1862,) p. 495, § 32. "In a disseisin under color of title the disseisin goes to the boundaries of the title." 15 Ga. 545. "A deed duly executed, delivered, and recorded, will, it is believed, in all the states, actually pass the seisin of the grantor of the estate thereby conveyed, without any formal entry, either by force of the express provisions of statutes or of the doctrine of uses." 2 Smith, Lead. Cas. (5th Am. Ed.) 561.

Wherefore the plaintiff claims that the de-

fendant was an actual disseisor of this estate in April, 1862, and much more that he was a disseisor at plaintiff's election. In defense of these acts Waller claims to have been acting in our interest—for us, in fact, as our agent; at the same time he claims title to the estate under and by virtue of his purchase. This agency we disavow, and it is unnecessary to go into an argument to show the absurdity of his acts compared with this claim of agency for us, since the law will not allow a man so to stultify himself as to claim that he is holding adversely and under his grantor at the same time. [Blight v. Rochester,] 7 Wheat. [20 U. S.] 535, 548; 3 N. H. 27, 49; 18 Johns. 355; 13 Johns. 118, 406. The only difficulty which has arisen in cases raising the question of disseisin, is where the owner does not elect to consider himself disseised. 5 Metc. [Mass.] 33; [Ewing's Lessee v. Burnet,] 11 Pet. [36 U. S.] 41; Spencer, [20 N. J. Law,] 487; 12 N. H. 9; 15 Ga. 545; 8 Cow. 601, 604. If the facts proved in evidence, and the law cited, maintain the proposition which I have enunciated, viz., that Waller by his acts desseised the plaintiff, at the time of the waste, then the argument is reduced to the question as to what are the liabilities of such a disseisor.

The plaintiff claims that Waller is liable for all the injury done to the estate by the defendants, by his lessees, or by strangers while he was in such possession. This subject involves the doctrine of "constructive waste," as incident to disseisin. Much of the learning of disseisin is so obscured in the Year Books by the abbreviations of a dead language, and the poor typography of a foreign one, as to be difficult of access by the modern student. Lord Mansfield remarked in Taylor v. Horde, in regard to the learning of one branch of this subject of disseisin, that it "was once well known, but is not now to be found," . . . "and the more we read, unless we are very careful to distinguish, the more we shall be confounded." Yet in the same case he said: "The consequences of actual disseisin, considered as such, continue law to this day." A. D. 1757. 1 Burrows, 112. To the same effect is 11 Fost. [31 N. H.] 41. Yet the Reports of Assize abound with cases of this kind, some of which are cited in 11 Coke, post; while their frequency in the old books, and their rarity in the modern, may be ascribed both to the increasing respect for modern titles to real estate, and to the fact that now nearly all the cases for damage to the realty fall within the purview of some of the numerous statutes of waste.

The consequences of disseisin were fully discussed, the principles involved well settled, and the disseisor's liability recognized, by frequent adjudications of the courts in the earliest period of our judicial history. Owing to the rude and lawless character of British society before the eleventh century, and the frequency of this particular injury

to the rights of tenants by men of great influence in the community, there seems to have grown out of the exigencies of the time and the equities of this class of cases, the common-law rule, that disseisors should be liable for "triple" the amount both of the mesne profits and the damage to the estate committed during their term. The state of society under which this rule of law originated, as well as the rule itself, is well set forth in the very interesting work of Mr. Reeves on the History of English Law. As to the form of the remedy for torts of this kind, the earliest seems to have been an action of trespass or a writ of entry; but after the time of Henry II. an assize, or assize of novel disseisin, was the common form of the action, until the statutes of waste were passed, when an action of waste or an action in the nature of waste, was the almost universal remedy. Says Mr. Reeves, vol. 1, (1st Ed., Quarto,) p. 242: "If judgment was given for the complainant the land was to be restored, with all its produce, received and to be received, from the disseisin to the time of judgment; and, as the sheriff was commanded to keep the land in peace till the assize was taken, the disseissee was to recover damages for any unjust abuse or misuse of the land in that interval. The disseisor was to suffer certain penalties. He was to be in misericordia regis in proportion to the nature of the disseisin; as, whether it was cum armis or without, so as the misericordia was never less than the damages; besides this, he suffered a penalty for the peace, if it had been violated. Again, if he had committed robbery with the disseisin, he suffered a treble penalty: the misericordia for the disseisin; for the peace, imprisonment; and for the robbery, as it is termed by Bracton, a heavy redemption. However, he did not lose life or limb, as the robbery was not prosecuted criminally. The disseisor, if he was the principal in the fact, was also to give to the sheriff on account of his disseisin, an ox and five shillings ('for the carcase of a pasturing ox, one shilling.' Herb. Inns Ct. p. 10); but those who were only in aid, force, or counsel, in general, did not give this mulct to the sheriff, though in some counties they did. The disseisor was also to render damages, to be estimated by the oath of the jurors, and further, if need were, to be taxed by the justices if the jurors had been excessive; though the justices were not to estimate the damages at a larger sum than the jurors, unless it were a very clear thing that the jurors had taxed them much lower than was reasonable or proper. Brac. Rom. Law, p. 186, 187, b. This liberty of increasing the damages was allowed to the judges, in order that disseisins might never escape the proper punishment of the law; for in those times of disorder and oppression there were many great men who would commit disseisins for the mere purpose of making the most of the fruits and profits during the time they could keep their unlawful possession, and when they had raised great sums thereby they could generally escape with a small misericordia, through the ill-placed lenity, of jurors, who, when they by their verdict took from a disseisor the land, were unwilling to load him besides with heavy damages. For these reasons, it was expected that the justices should examine very carefully into the change that had been made on the land since the disseisin, either through the willfulness or neglect of the disseisor, or any other wise; all which he was to be compelled to make good, though much damage might have happened, by death of cattle and other accidents, which it was out of his power to govern; nor was any allowance to be made the wrong-doer for improvements."

It is obvious from the above extract, which contains the law as known to the earliest writers, (Brac. Rom. Law, p. 168, et Britton, cc. 42, 44,) what were the liabilities incident to disseisin at the common law. But Lord Coke was of the opinion that the lessor had no remedy against his lessee for waste, prior to the statute of Marlborough, unless he had bound him by covenant not to do waste. 2 Inst. 145. Therefore the statute of Marlborough, (52 Hen. III. c. 23, A. D. 1267,) enacted that "fermors" should be liable for "full damage" and a "grievous amercement." Lord Coke, commenting upon the non faciant of this statute, says: "This prohibiteth that farmers, shall not do waste, and yet if they suffer a stranger to do waste they shall be charged with it, for it is presumed in law that the farmer may withstand it; 'et qui non obstat obstare potest facere videtur.' In 1278 the statute of Gloucester was passed, which enacted the old common-law liability of disseisors, viz., "triple damage" against "termors" for waste; and on this statute Lord Coke comments as follows: "The tenant shall by construction of law answer for waste done by a stranger." 2 Inst. 303; 1 Inst. 43, 46.

Subsequent to the statute of Marlborough, five different statutes of waste were passed, including 11 Hen. VI. c. 5; 6 Edw. I. cc. 5, 13; 13 Edw. I. c. 22, (2 Westminster;) 20 Edw. I. Stat. 2; 9 Hen. III. c. 4; giving "triple," "double," and actual damages against the holder of every possible species of an estate, except disseisors and trespassers, who were left to be mulct by the rule of the common law; and incident to the actions brought under these statutes was the doctrine of "constructive waste." During the thirteenth, fourteenth, and fifteenth centuries, English society became less turbulent, and nearly all of the actions for damage to the realty were included in some of the various statutes of waste, and we find the severity of a "triple" penalty relaxed to actual damages with costs, which were given to the successful party for the first time by St. Marl. 2 Reeves, Eng. Law, (2d Ed.) p. 148. The first case I find translated, which is ex-

actly in point, is Moore v. Hussey, Hob. 98, (A. D. 1627,) the material part of which, together with the valuable note of Justice Williams, I extract from the Boston edition of 1829: "At the common law, and before the statute of Gloucester, c. 1, if A were disseised by B, and B enfeoffed C, or were disseised by him, A had no remedy for damages against the feoffee or disseisor, but was to bring his assize against B, who was the immediate disseisor, and therein he was to recover the mesne profits by way of damage, not only for his own time, but also for the profits received by the feoffee or second disseisor. And likewise if A, the first disseisee, had re-entered, whereby he had lost his assize, he might by an action of trespass, vi et armis, brought against his disseisor, recover the mesne profits for all the mesne possessions; but neither at the common law, nor now, can he recover upon his re-entry damages against the feoffee, lessee or second disseisor by action of trespass vi et armis; for that fits not his case, as to them who did no immediate trespass."

The doctrine of the text is supported by the following authorities: Spelman v. Pole, 34 Hen. 35; Kingsmil, Frowike, and others, 13 Hen. VII. 15, 16; Liford's Case, 11 Coke, 51; Symons v. Symons, Het. 66; Brooke, Abr. "Trespass," pl. 35; Bac. Abr. "Trespass," G., 2; 1 Wood, Conv. 108; Keilw. pl. 2; Vin. Abr. "Trespass," R., 4, pls. 2, 5; Case v. De Goes, 3 Caines, 261; Fletcher v. McFarlane, 12 Mass. 46; Emerson v. Thompson, 2 Pick. 491; Stearns, Real Act, in notis, 419. Says the learned author of these notes: "Those who hold that the disseisee may maintain an action of trespass against the alienee of the first disseisor, or against a second disseisor, found their opinion, first, on a legal fiction, that by the re-entry of the disseisee he is remitted to his original possession, and is as if he had never been out of possession, and then all who occupied in the meantime, by what title soever they came in, shall be answerable to him in trespass for the profits during their own time; and secondly, upon a liberal construction of the statute of Gloucester, c. 1, which provided that in an assize of novel disseisin the tenant should be liable to the disseisee for damages if the disseisor was unable to satisfy them. To this it is answered that a legal fiction ought never to be perverted to make an act which was lawful when done, a trespass by relation ex post facto, because 'in fictione juris semper equitas existit;' and, secondly, that the statute of Gloucester was limited in its operation to certain specified cases of possessory and ancestral writs, of which trespass is not one, and therefore is left as at common law; and by the common law the disseisor alone was liable to damage, though the land might be recovered against his alienee. Again, the action of trespass vi et armis, as suggested in the text, fits not

the case of the disseisee as to the alienee of the disseisor or as to his disseisor who did no immediate trespass to the original disseisee. This action is the appropriate remedy for an injury to the possession only. A mere title, however valid, or a mere right of entry or possession, however perfect, is not sufficient; so strictly true is this position, that the disseisee can not maintain the action even against his immediate disseisor for any act done by him after the disseisin and during the continuance of his possession. Even after his restoration to the possession, it is only by the legal fiction of a remitter, a kind of jus postlimini, that he is enabled to maintain the action against the tort feasor himself. The disseisor, while in possession, is seized of an estate in fee, an estate recognized by law, an estate sufficient to satisfy the covenants in his deed of lawful seisin, and of good right to convey. Vide Pincombe v. Rudge, [Yel. 139,] in notis. His alienee therefore comes into possession by legal title, which, though not indefeasible, is so far valid as to protect him from being a trespasser by his entry. He enters under the authority of a person having title and in actual possession. He does not therefore violate the possession of any one; in other words, he does not commit a trespass against any one. Can the alienee, then, be made a trespasser ab initio by a fiction of law, without any unlawful act of his own, by the subsequent entry of the disseisee? The general rule of law is that a trespass must be an injury at the time when the act is done, and that an injury that has been derived from an act which was in the first instance lawful can not be a trespass. The exception to the rule is that whenever the person who at first acted with propriety under an authority or license given by law, afterwards abuses that authority or license, he becomes a trespasser ab initio. This exception does not apply to the alienee of the disseisor, who enters and retains his possession by title. His case, therefore, comes within the general rule; and it would seem, therefore, that, upon legal principles, he is not liable in trespass to the disseisee either before or after his re-entry. It may be said that this doctrine does not apply to a second disseisor because his original entry is tortious: that he enters without title or color of right, and is therefore liable in trespass as a tort feasor to the first disseisee. But this reasoning is by no means satisfactory. As trespass is the appropriate remedy for an injury to the possession only, the action must be brought by him whose possession is disturbed, that is, by the first disseisor. The first disseisin, by his disseisin of the owner, becomes seised of an estate of inheritance which, though defeasible by the disseisee, is a good and valid estate as to all who are strangers to the title. The trespass, therefore, which the second disseisor commits by entering upon the pos-

session of the first disseisor, is a trespass against the latter, and not against the original disseisee; accordingly it is well settled that the first disseisor may maintain his action against his disseisor, and, if the original disseisee may also maintain the action, then the trespasser will be doubly punished for the same trespass." Paramour v. Yardley, 2 Plow. 546.

The case of 2 Pick. 473, may be explained by making a distinction between the heir of the disseisor and a purchaser. As to the value of this authority (Hobart) Lord Kenyon, in 6 Durn. & E. [6 Term R.] 441, alluded to it as "his most excellent volume of reports." The case of Liford, 11 Coke, 51, is to the point, and the best decision in the old reports on this subject. "If one disseises me, and during the disseisin he cuts down the trees, or grass, or the corn growing upon the land, and afterwards I re-enter, I shall have an action of trespass against him vi et armis for the trees, grass, corn, &c.; for after my regress the law as to the disseisor and his servants supposes the freehold always continued in me. But if my disseisor makes a feoffment in fee, gift in tail, lease for life or years, &c., and afterwards I re-enter, I shall not have trespass vi et armis against those who come in by title; for this fiction of the law that the freehold continued always in me shall not have relation to make him who comes in by title a wrong-doer vi et armis; for, in fictione juris semper aequitas existit." H. 7, Hilary term 11, Y. B. pt. 11; 19 Hen. VI. 28b.; 34 Hen. 6d.; 33 Hen. VI.; 39 El. B. R.; Holcombe v. Rawlins, 2 E. 4, are not to the contrary; they only hold that the lessee is liable, &c. But in such case I shall recover all the mesne profits against my disseisor, in the same manner as the disseisee in such cases should recover in an assize at the common law before the statute of Gloucester, c. 1, damages only against the disseisor; also it is to be presumed that the feoffee has given consideration or recompense to the disseisor, and that the lessee has paid rent to him or other consideration, and therefore in reason the disseisor is to be charged with the whole. 2 Rolle, 554; Owen, 112; Cr. El. 540. The same law if my disseisor is disseised, and afterward I re-enter I shall not have an action of trespass against the second disseisor, because the said fiction of law as to action extends only to my disseisor; and if I should punish the second disseisor he would be twice charged; and therefore I shall recover all the mesne profits against my disseisor, his servants and others, who have committed the trespass by his commands and his right; and so has the law been often taken upon consideration of all the books. Peter de Vanlore's Case, 9 Edw. 3, 2, a. b.; 10 Hen. VI. 14; 19 Hen. VI. 27; 22 Hen. VI. 21; 32 Hen. VI. 32; 33 Hen. VI. 46; 34 Hen. VI. 30; 37 Hen. VI. 35; 38 Hen. VI. 28; 2 Edw. IV. 18; 9 Edw. IV.

39; 11 Edw. IV. 4; 20 Edw. IV. 18; 21 Edw. IV. 5, 74; 22 Edw. IV. 31; 6 Hen. VII. 9; 10 Hen. VII. 27; 12 Hen. VII. 25; 13 Hen. VII. 15b.; 1 Washb. Real Prop. (2d Ed.) 105, 117, § 35; Chipman v. Emeric, 3 Cal. 283.

The modern case which discusses this question is White v. Wagner, 4 Har. & J. 373. This cause was considered with great learning and research, both arguendo and by the court which consisted of Buchanon, Earle, Johnson, and Martin; and Johnson who gave the opinion says: "It is novel in the law to make persons, morally innocent, responsible for the acts of those over whom they had no control. In various instances, where the property of the owner is placed in the care of another, such person is liable to the owner for its loss or for injuries done to it, which the possessor could not restrain. The common carrier, the sheriff, and others are responsible for losses which they could not prevent. As the property of the landlord is placed in the tenant's possession, who has the legal power to prevent all waste from being done to it, and to recover for it when committed, as in most cases it would be impossible for the landlord to ascertain in time, or come at the wrong-doer, it appears to have been the policy of the law to cast the liability on the part of the tenant for all waste committed on the property, except when caused by the act of God, or the king's enemies." The above case establishes clearly the "liability of the lessee for all injuries amounting to waste done to the premises during his term, by whomsoever these injuries may have been committed, except acts of God and the king's enemies."

We have thus traced the history of this rule of the common law from the earliest times to its full recognition by the American courts, (White v. Wagner, ante,) and in concluding this point, may add that this principle of law is founded upon the soundest reason; for deplorable indeed would be the condition of owners of real estate if such were not the law. This liability is the only security they have against collusion with strangers to commit waste. The owner is presumed to be absent from the premises, and not to know who committed the waste. If the person in wrongful possession is not liable, he will have small inducement to prevent it or incur the trouble and expense of a lawsuit to recover damages forthwith. This reason applies with special force to this particular case. Waller could have recovered damages for the waste from the rebel authorities, which from the circumstances, was and is impossible for Bigler to do. The proof which was easy for, and not denied to Waller, it is impossible for us to obtain. Waller's meddling with the estate was an attempt at the grossest fraud on Bigler, and his liability as a disseisor for his acts is clear and well defined by the law of Virginia. Tate's Dig. Va. (Ed. 1823.) 518; 2 Hen. Va. St. 563; 1 St. at Large Va. (N.

S.) p. 193, (1682–83;) Code Va. 1849, tit. "Waste;" Code Va. 1860, tit. "Waste;" 6 Rand. [Va.] 8, 18.

The law of Virginia in this respect does not differ from the common law. The reason of the law applies in this particular case with greater force than in any one which has fallen under my observation; and there is no equity which can relieve Waller, for he does not come into court with clean hands. It is an evidence that the questions raised by this point have been adjudicated in the said action in New York, where it was found that Waller was an actual disseisor and liable for the waste committed during this period, which we submit is conclusive in this action. If it is urged that this may have been law once, but is not now, we reply in the language of Fortescue, (408:) "For there are many things that have never been altered, and are law now."

The United States commissioner found fifteen thousand dollars rent for three years' possession. This finding assumes the three following propositions, viz.: (1.) Waller's possession during that period. (2.) His liability for rent. (3.) The value of the rent, fifteen thousand dollars.

1. The question of Waller's possession has been argued, (ante.)

2. If Waller was in possession of the estate, he is liable for the full value of the rent at the time he took possession (April 1, 1862), nor can he be heard to say that waste committed by himself, or by his lessees, or by strangers during his possession, should lessen the amount of the rent for which he is liable. (a). Since it would be taking advantage of his own wrong, which is contrary to a maxim. (b). It is clearly settled that waste by a stranger will not excuse a lessee from the payment of rent, and it would be strange if a wrong-doer could be in a better position in this respect than a lessee under the ordinary covenants. (c). The defendant can not plead that this estate was neutral ground at the time of his possession, and so very dangerous as to be of no value, since the waste for which he is liable (the destruction of the wharf and mill), was the cause of its being abandoned territory or neutral ground. Had the dock and mill remained, it would have been a strategic point, and occupied by either army to the advantage of the owner.

3. The value of the rent is estimated by Smith at seven thousand dollars per annum. Bigler estimates it at the same, and Southard at from five thousand dollars to ten thousand dollars per annum. There is not a scintilla of evidence in the case to show that this estimate was not the minimum rental value of the estate when Waller took possession and before the waste was committed. Paradine v. Jane, Aleyn, 26, 27; Pollard v. Shaffer, 1 Dall. [1 U. S.] 210; 1 Ch. Cas. 72, 84. "If a man receives my rent, it is at my election if I will charge him with a disseisin by bringing an assize." Vin. Abr. "Disseisin," p. 15, Ja. B.; Hill. Rem. 104.

Waller received rent for the estate in the above period two thousand dollars from the C. S. A., and is liable for full rent to plaintiff whether he collected it or not. 8 Term R. (39 Geo. III.) 267; Perk. Conv. § 738; 1 Coke, 98a; 1 Rolle, Abr. 236; Style, 162; Plow. 29; 1 Rolle, Abr. 519, 939; Sid. 266, 447; Style, 431; Id. 48. It is in evidence that Waller's liability for rent during this period has been adjudged in said case in New York: "And when a point that has been decided on the merits in a suit at law is again brought in question on the same ground in equity, it is res adjudicata." Kingsland v. Spalding, 3 Barb. Ch. 143; 1 Johns. 96; 1 Eng. [6 Ark.] 317.

Plaintiff seeks to recover against Waller, the value of the personal property taken from the estate while it was in Waller's possession. Bigler swears that this amount is ten thousand dollars, which not being denied by Waller, is taken for confessed. If it is claimed that the rebel authorities were public enemies in such a sense as to constitute an exception to a disseisor's common-law liability or excuse his torts done by their authority, it may be answered on the authority of Touteng v. Hubbard, 3 Bos. & P. 302, approved in Esposito v. Bowden, 4 El. & Bl. 978, that a stranger can not plead the act of his own government as an excuse for the breach of his own contract, because it would be taking advantage of his own wrong; a fortiori, neither can Waller plead to his liability for constructive waste, that the rebel authorities (his government) committed the waste. There is a decision in the Year Books, (33 Hen. VI. p. 6,) that such public enemies must not be "traitorous subjects of the king." But they were not public enemies. Vide Justice Chase, Raleigh, N. C., decision, Shortridge v. Macon, [Case No. 12,812.]

It is urged that equity will relieve the rigor of the common law in this particular of "constructive waste." To that argument it may be answered: "If the law has determined a matter with all its circumstances, equity can not intermeddle." Will. Eq. Jur. 39. "The assertion that chancery will decree against the general rule of law, and relieve against every mischief which happens, contrary to natural justice, is not founded in principle or supported by authority." Id. 39. "And it is said in Rooke's Case, 5 Coke, 99b, that discretion is a science not to act arbitrarily, according to men's wills and private affection; so the discretion which is executed here is to be governed by rules of law and equity which are not to oppose, but each in his turn to be subservient to the other." Id. 41. "A court of equity has no power to relieve against a general rule of law, nor to abate the rigor of the common

law, nor to afford relief in cases against natural justice, in every case, for many such exist without any redress, legal or equitable." Id. 41. "Equity has jurisdiction in cases of rights recognized and protected by the municipal jurisprudence, where a plain, adequate, and complete remedy can not be had in the courts of common law." Id. 41. "The jurisdiction of equity is assistant, concurrent, and exclusive." Id. 41. "A court of equity can in no case relieve against a positive act of the legislature or an established rule of the common law." Id. 48. "When a court of chancery has once gained possession of the cause, if it can determine the whole matter it can not be the handmaid of other courts nor beget a suit to be ended elsewhere." Id. 41.

The report of the commissioner should be confirmed, and judgment entered against William Waller in favor of the plaintiff for the sum of twenty-six thousand one hundred and eighty-six dollars, with interest from April 3d, 1865, and costs; and a decree entered that defendants Waller and Saunders execute a release deed to James Bigler of all claim to said Rippon Hall estate, and Bigler's bond be delivered up and canceled.

J. Alfred Jones, for respondents.

CHASE, Circuit Justice. The general principles on which this case must be adjudicated were announced at the last term. But a suit commenced by the defendant (Waller), in a state court of New York against the plaintiff (Bigler), prior to the bringing of the present suit in this court was then pending and undetermined, and we did not think proper until that suit should be disposed of to proceed to final decree here.

That suit, however, has been terminated by discontinuance, and there is no reason why a final disposition of the litigation should not now be made.

The principles stated at the last term require that all the exceptions taken to the report of Commissioner Chahoon be sustained, except so far as the views now to be stated may affect this general order.

It is not denied that on May 10, 1860, the sum of thirteen thousand dollars was due from the plaintiff (Bigler) to the defendant (Waller), as a balance of the purchase money agreed to be paid for the estate sold to the former by the latter.

The questions to be considered are these:

1. By what rule shall interest be computed on this balance? In other words, shall interest be allowed for the period during which intercourse between the parties, and between the parts of the country in which they respectively lived was suspended by the civil war?

In a case decided by the circuit court of the United States for the district of North Carolina, [Shortridge v. Macon, Case No. 12,-812,] it was held that interest did not cease during the recent civil war, in consequence of the residence of the parties to the contract in the hostile sections of the country. Since that decision was made it has been held by the supreme court of the United States, in the case Hanger v. Abbott, 6 Wall. [73 U. S.] 532, that the statute of limitations was suspended by the civil war in the insurgent states as to non-residents, having causes of action against residents of those states. And in the case of Ward v. Smith, 7 Wall. [74 U. S.] 452, while it was held that under the circumstances of that particular case interest did not cease, the opinion of the court was put upon circumstances creating an exception to the general rule that interest does not accrue during war between citizens or subjects of belligerent states. The general rule was neither affirmed nor denied; but it may not unreasonably be inferred from the language of the court, that if the direct question presented by this case were before that tribunal, it would be resolved in favor of the maker of the bond. Bigler, the maker, was in occupation of the estate purchased at the commencement of the war by his agent; and not only was he wholly excluded from occupancy and from possession during its continuance, but the improvements put on the property by him at great cost were destroyed, and the estate otherwise was greatly injured. Waller, the obligee, was in the Confederate army, and at a sale made under the trust deed executed by Bigler to secure the bond became himself the purchaser; and he was doubtless, though since the war he has disclaimed title to the land as against Bigler, entitled as such purchaser to the possession.

We have already said that Waller is not to be held responsible for the injuries sustained by Bigler in consequence of the war; but, on the other hand, we can not doubt that if interest on a debt should cease in any case it should cease in this; and our duty is to determine this question as we believe it would be determined by the supreme court if submitted to its consideration.

It is more difficult to determine the period during which interest should cease. The actual beginning of war against the United States, doubtless, preceded the proclamation of the president of April 15, 1861, calling out the militia to suppress insurrection; but the proclamation declaring the blockade of the ports of the insurgent states must be regarded as the first formal recognition of the existence of civil war by the national government.

That proclamation was issued on April 19, 1861, and that date, therefore, must be taken as the date of the commencement of the war. The period of its termination has not been so definitely ascertained.

It was declared by the concurrent action of the President and of congress to have ended on August 2, 1866, and this date has been recognized by the supreme court as the end of the rebellion, intended by the abandoned and captured property act and some other legis-

lative provisions. In another case depending on the effect of the statute of limitations the court thought fit to decline fixing any precise date of termination applicable to all cases.

This question being thus left open, we think it right in this case, to take the establishment at Richmond of the adhering government of Virginia as the recognized government of the whole state as the end of the war in this state. This event may be said to have taken place when the executive department of that government was removed from Alexandria to Richmond, on May 26, 1865. The period, then, to be excluded in the computation of interest is the time from April 19, 1861, to May 26, 1865.

2. What credit, if any, is to be given to Bigler for money received by Waller from the Confederate government?

The evidence shows that the sum of two thousand dollars, was thus received in October, 1863, by way of compensation for use made of the property and of indemnity for waste committed upon it. At that time it appears that the rate of Confederate notes for gold was thirteen for one. For this sum of two thousand dollars, reduced to the specie equivalent, with interest on the sum thus ascertained, credit is to be given on the bond.

3. What credit, if any, should be given to Bigler for damage sustained by reason of non-fulfillment on the part of Waller of his contract to release to purchasers? It is clear enough upon the evidence that under the original contract of purchase, Bigler had a right to sell portions of the estate, and to have these portions released to the purchaser on payment to Waller of so much of the purchase money as would leave his security unimpaired. And it is sufficiently proved that some time after the purchase, in 1853 or 1854, Bigler had some offers to buy small parcels of the tract, and applied orally to Waller for a release; and that Waller, for some reason, refused. But it does not appear that Bigler at that time, or at any time afterwards, until this controversy arose, set up any claim for damages. On the contrary, Bigler continued to make payments on account of the purchase until May, 1860. Under these circumstances it would be difficult to sustain the claim for damages were the proof of the quantity of land sold, the price offered, and the demand for release under the contract much clearer and more specific than it is. But on all these points the evidence is vague and indefinite—much too vague and indefinite to form the basis of a decree. We are obliged, therefore, to deny any credit on account of damages. A decree may be entered in comformity with these principles.

[NOTE. Complainant appealed from the decree of the circuit court, directing the payment of $17,377.48, in United States coin, to the administrator of Waller; and in delivering the opinion of the supreme court in Bigler v. Waller, 14 Wall. (81 U. S.) 297, Mr. Justice Strong held that there was no sufficient reason for the allowance of a credit on complainant's bond in consequence of Waller's refusal to execute releases, passed on several questions not raised in the principal cause, and reversed the decree of the lower court, on the ground that it directed the amount of the decree to be paid in United States coin. For a hearing on motion to dismiss the appeal, in the supreme court, see 12 Wall. (79 U. S.) 142.]